IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BLAKE MARINE GROUP, LLC | § | |
| | § | |
|     Plaintiff, | § | |
| v. | § | Civil Action No. 19-468 |
| | § | |
| EPIC ALABAMA RECYCLERS, LLC, | § | *In Admiralty* |
| *In personam*, and the | § | *In Personam* |
| NOBLE AMOS RUNNER, | § | *In Rem* |
| Her engines, tackle, furniture, | § | |
| Equipment, appurtenances, etc., *in rem*, | § | |
| | § | |
|     Defendants. | § | |

**BLAKE MARINE GROUP, LLC'S OPPOSITION
TO EPIC ALABAMA RECYCLERS, LLC'S MOTION TO DISMISS ARREST**

Plaintiff, Blake Marine Group, LLC ("Blake"), submits this opposition to the Motion to Dismiss Arrest filed by Defendant, EPIC Alabama Recyclers, LLC ("EPIC"). (R. Doc. 23). EPIC has moved to dismiss arrest pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds that the NOBLE AMOS RUNNER ("AMOS RUNNER") is allegedly not a "vessel" and therefore is not subject to a maritime lien under 46 U.S.C. § 31301, *et seq.* (R. Doc. 23-1). As is more fully discussed below, the AMOS RUNNER is a vessel subject to a maritime lien. Accordingly, this Court has federal subject matter jurisdiction over this case, and EPIC's Motion must be denied.

**I.     INTRODUCTION**

The central issue is whether the AMOS RUNNER is a "vessel" pursuant to General Maritime Law.

This case involves unpaid charges owed to Blake arising from its provision of transportation services related to the AMOS RUNNER, a mobile semi-submersible oil rig (MODU) owned by EPIC. These services were provided in connection with the 450 nautical-mile

movement of the rig to EPIC's shipyard in Mobile, Alabama. Blake initiated the current proceeding against the AMOS RUNNER *in rem*, and EPIC *in personam*, as a consequence of EPIC's failure to pay Blake $841,761.51, representing charges for the services Blake provided. (R. Doc. 1, ¶ VII). Despite acknowledging its indebtedness and even committing to payment of same, EPIC has refused to honor its obligations. (*Id.*, ¶ VIII).

Built in 1982, the AMOS RUNNER was originally constructed as a submersible suitable for shallow water. It was subsequently converted to a MODU in 1999, configured with typical MODU capabilities, such as those necessary for offshore drilling operations, housing a range of various personnel, and the transportation of drilling equipment and members of her crew.  Her design includes 27 ballast tanks to enable her ability to float. The ballasting system remains operational such that she can be refloated and moved.

Starting around January 2019, EPIC and Blake entered into various contracts with one another ultimately culminating in a 450 nautical-mile "wet tow"[1] of the AMOS RUNNER from its offshore stacked location in the West Cameron area of the Gulf of Mexico to Mobile, Alabama.

Blake played a substantial role in coordinating the logistics of this voyage and provided numerous services to the AMOS RUNNER, including:

1.   Food for crew members;

2.   Fuel;

3.   Towing equipment;

4.   Repairs and labor material; and

5.   Supplies and furnishings needed to deballast and refloat the vessel for transportation via towage to EPIC's yard in Mobile, Alabama.

---

[1]Meaning the rig was floating on its own hull while being pulled.

(*Id*., ¶¶ VII, XIV).

The allegations in EPIC's Motion to Dismiss concerning these services, as well its portrayal of the physical characteristics of the AMOS RUNNER, are embellished with inaccuracies. For example, EPIC maintains that the AMOS RUNNER "has no operational equipment, no propulsion, and no ability to self-generate power. All power to the AMOS RUNNER during transit to the scrap yard was to be provided by portable generators….the AMOS RUNNER had no operating galley to prepare food, the fuel onboard has spoiled, and no fresh water was stored onboard for drinking, cooking, showering, or otherwise maintaining a crew." (Doc 23-1, p. 13). These statements are untrue.

The AMOS RUNNER's equipment was not impaired while it was stacked in its offshore location, nor was it impaired during or after the voyage. ("Affidavit of Eli Zatezalo", Exhibit A). For example, its operational navigation equipment remained onboard at all times. *Id.* at ¶ 6. The AMOS RUNNER had the ability to self-generate power, as both sets of the main generator and emergency generator were operational at all times. *Id.* at ¶ 10. In fact, the latter was utilized to provide basic power throughout the rig and to transfer onboard fuel, which EPIC incorrectly characterizes as "spoiled," from pontoon tank no. 6 to the day tank for daily consumption. *Id.* at ¶ 12.

As previously mentioned, Blake provided direct air transportation for crew members of the AMOS RUNNER. *Id.* at ¶ 11. This "riding crew" remained onboard for the entirety of the tow to Alabama. *Id.* No EPIC employee was onboard the AMOS RUNNER while it was in the process of being refloated, nor was any EPIC employee onboard at any time during the tow. *Id.* at ¶ 9. In further contradiction of EPIC's assertions, the AMOS RUNNER did in fact have an operating galley. The riding crew utilized the galley, including the stove, on a daily basis to prepare meals.

*Id.* at ¶¶ 13, 14. Additionally, the AMOS RUNNER had sufficient potable water onboard for the riding crew to take daily showers, utilize the toilets and clean cooking supplies. *Id.* at ¶15.

Not only were these physical characteristics unimpaired during the voyage, the AMOS RUNNER remains capable of being deballasted and moved across water. *Id.* at ¶ 21. This is further supported by the fact that the AMOS RUNNER is currently being marketed for sale to foreign buyers, which would require her to be towed once again on water and navigated as a condition of purchase. *Id.* at ¶ 24.

EPIC also describes future events contemplated under the Teaming Agreement and/or sale agreement.  While the contracts referred to by EPIC contemplate the future impairment of the AMOS RUNNER's equipment, they do not speak to her status prior to and during the tow, and they do not speak to her status today.

## II.   LAW AND ANALYSIS

### A.   EPIC's motion concerns a jurisdictional fact that is an essential element of a claim of a maritime lien, and should be analyzed on a summary judgment standard.

Vessel status is a prerequisite of Blake's maritime lien claim against the *in rem* defendant. 46 U.S.C. § 31342(a)(1); *Galehead Inc. v. M/V Angila*, 183 F.3d 1242, 1244 (11th Cir. 1999). Not only does the determination of whether the AMOS RUNNER is a "vessel" present an issue of jurisdictional fact, it is also an essential element of the merits of Blake's maritime lien claim. *See Martin v. Fab-Con, Inc.*, 9 F. Supp. 642, 645-46 (E.D. La. 2014) (treating 12(b)(1) motion based on vessel status as motion for summary judgment, as vessel status was a salient component of plaintiff's case); *see also Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864 (11th Cir. 2010). Therefore, because the issue under consideration is an attack on the merits of the case, this Court should analyze the Motion to Dismiss Arrest as a summary judgment. *See Lawrence v.*

*Dunbar*, 919 F.2d 1525, 1530 (11th Cir. 1990) ("When the jurisdictional basis of a claim is intertwined with the merits, the district court should apply a Rule 56 summary judgment standard when ruling on a motion to dismiss which asserts a factual attack on subject matter jurisdiction").

The summary judgment standard is well-established: "The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Each inference from the record is to be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The movant bears the burden of showing an absence of genuine issue to any material fact. *Fleming v. Clipper Ams.*, 1997 U.S. Dist. LEXIS 6540, at *5 (S.D. Ala. Apr. 4, 1997). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992).

### B.      Governance of maritime liens.

"A maritime lien is an interest in maritime property that is enforced *in rem* under the exclusive admiralty jurisdiction of the federal courts." 8 Benedict on Admiralty § 7.01 (2019). Only admiralty courts, having exclusive jurisdiction over proceedings to enforce maritime liens, may execute a maritime lien and allow enforcement of same for necessaries. *The LOTTAWANNA*, 88 U.S. (21 Wall.) 558 (1875).  Obtainment of a maritime lien requires that a person satisfy three elements: (a) provision of necessaries; (b) to a vessel; (c) on the order of the owner or agent. *Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1244 (11th Cir. 1999).

The second prerequisite, "to a vessel" is the center of this present dispute. As the basis for seeking dismissal, EPIC contests the status of the AMOS RUNNER as a "vessel." It argues that, "as a matter of law and fact, the AMOS RUNNER was not a 'vessel' for which 'necessaries' were

provided." (R. Doc. 23-1, p. 8).

### C.  Vessel status depends on practical capability, not subjective intent.

The Rules of Construction Act defines the term "vessel" to include "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. In an early seminal case on vessel status, the Supreme Court broadly defined vessels as "all navigable structures intended for transportation." *Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625, 628 (1887). Over the years, various exotic watercraft were deemed vessels. One federal court even opined that the scope of the definition was so broad that "three men [floating] in a tub would also fit our definition, and one probably could make a convincing case for Jonah inside the whale." *Burks v. Am. River Transp. Co.*, 679 F.2d 69, 75 (5th Cir. 1982).

The Supreme Court again visited the definition in 2005. *Stewart v. Dutra Constr. Co.*, 543 U.S. 481 (2005). In discussing the statutory language that a vessel must be "used, or capable of being used, as a means of transportation on water," the Court explained this requirement did not demand that a vessel be used *primarily* for such purposes. Rather, the determination to be made is "whether the watercraft's use as a means of transportation on water is a practical possibility or merely a theoretical one." *Id.*, at 496. "[A] watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been <u>permanently</u> moored or otherwise rendered practically incapable of transportation or movement." *Id.* at 494 (emphasis added). As to the latter point, the distinction is sensible because structures would otherwise move in and out of vessel status even if temporarily moored or anchored. *Id.*

In 2013, the Supreme Court offered guidance for admiralty courts concerning "borderline cases where 'capacity' to transport over water is in doubt." *Lozman v. City of Riviera Beach, Florida*, 568 U.S. 115, 129 (2013). The Court addressed vessel status under 1 U.S.C. § 3 to

determine whether a floating home was a vessel. After a detailed analysis of the home's physical characteristics, the Court decided it was not a vessel. Drawing upon *Stewart*, the Court ruled that "a reasonable observer, looking to the home's physical characteristics and activities, would not consider it to be designed to any practical degree for carrying people or things on water." *Id.* at 118.

The Court's recognition of the justification for adopting the reasonable observer standard in *Lozman* is especially salient. Justice Breyer affirmed "the need to eliminate the consideration of evidence of subjective intent." *Id.* at 128. "[W]e have sought to avoid subjective elements, such as owner's intent, by permitting consideration only of objective evidence of a waterborne transportation purpose." *Id.* If an owner's intent was dispositive on the issue of vessel status, nothing more than the submission of an affidavit declaring the structure would never navigate again would be needed to settle the issue.

Importantly, post-*Lozman* decisions also recognize that the ruling in *Lozman* "reflects the Supreme Court's rejection of the 'anything that floats' approach," such as a the tub carrying three men in the nursery rhyme. *Warrior Energy Servs. Corp. v. ATP Titan*, 941 F. Supp. 2d 699, 706 (E.D. La. 2013). In other words, *Lozman* "shot across the bow" of prior decisions attributing vessel status to various exotic, atypical structures – similar to a floating home. *Mooney v. W & T Offshore*, No. 12-969, 2013 U.S. Dist. LEXIS 30091, 2013 WL 828308, at *4 (E.D. La. March 6, 2013). However, it did not intend an effect of disrupting established law attributing vessel status to structures like the AMOS RUNNER.

## III.    The AMOS RUNNER is a vessel under General Maritime Law.

This is not a "borderline" case. A straightforward application of *Stewart* mandates a finding that the AMOS RUNNER is a vessel under General Maritime Law. And, a finding of vessel status

is unaltered by *Lozman*. The courts have consistently treated semi-submersible drilling rigs like the AMOS RUNNER as vessels in navigation. As one federal district court noted, "[l]ongstanding precedent in [the Fifth Circuit] establishes that mobile offshore drilling units [not permanently attached to the seabed] are vessels under general maritime law." *See BW Offshore USA, LLC v. TVT Offshore AS*, 145 F. Supp. 3d 658, 662 (E.D. La. 2015); *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. 2d 943, 949 (E.D. La. 2011) *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d 157 (5th Cir. 2014).

The AMOS RUNNER is unequivocally a "vessel" under general maritime law's definition of that term, being that it is a conventional waterborne structure that has remained practically capable of being used as a means of transportation over navigable waters. *Stewart*, 543 U.S. at 497. In fact, this is exactly what the AMOS RUNNER did in the context of the current proceeding before this Court. The subjective intent of scrapping the AMOS RUNNER sometime in the future does not change the objective realization that the AMOS RUNNER was and is capable of transportation. It was towed 450 nautical-miles to EPIC's shipyard in Mobile, Alabama, with a riding crew onboard for the entirety of the tow. It is currently being marketed for sale to buyers outside of the United States, which necessarily requires that it be capable of towage on water and navigated as a condition of purchase. There is no limitation being marketed to such buyers indicating that the AMOS RUNNER could not be navigated to foreign ports in order to facilitate a sale. The rig is not currently in the process of being scrapped. As evidenced by the recent tow to Mobile, the AMOS RUNNER has not been so impaired, nor has its design been so converted, as to result in rendering it practically incapable of navigation as a "vessel."

**1.      Cases cited by EPIC do not support a finding of no vessel status in this matter.**

Despite the AMOS RUNNER's status as a MODU, which has been traditionally considered

a vessel, EPIC's motion relies on Fifth Circuit "borderline" vessel cases.  The first case EPIC points to is *Martin v. Fab-Con, Inc.*, 9 F. Supp. 3d 642 (E.D. La. 2014). The issue in that case was whether a quarterbarge constituted a vessel under general maritime law. As the court noted, objective evidence in the record showed that the structure "was constructed to serve solely as stationary housing accommodations." *Id.* at 644. It was "not designed to transport passengers, cargo, or equipment across the water, and it was never used in such a way." *Id.* The quarterbarge simply was not designed for maritime transportation; "[i]nstead, it was designed exclusively to house workers, serving…as a floating hotel." *Id.* at 649. The Court found that a reasonable observer, looking at the quarterbarge's physical characteristics, would not consider it designed to a practical degree for transportation over water.

Unlike the quarterbarge, and as courts have consistently held, MODUs are inherently designed for mobility, purposefully constructed with necessary capabilities enabling oceangoing movement. More specifically, the AMOS RUNNER is clearly designed for transportation over water, and its design has not been impaired such that a reasonable observer under *Lozman* would conclude the rig lacks vessel status. To the contrary, a reasonable observer, looking at the rig's physical characteristics and design, would undoubtedly consider it designed for maritime transportation.

Another Fifth Circuit case EPIC relies on is *Baker v. Director, Office of Workers' Compensation Programs*, 834 F.3d 542 (5th Cir. 2016). In that case, the issue was whether the Big Foot, a tension leg offshore platform, was a vessel. It was noted at the outset that the parties conceded the Big Foot was not built to regularly transport goods or people. 834 F.3d at 544. Its various components were constructed at several locations. After full assembly, it would be towed approximately two hundred miles offshore and anchored to the seabed where it would be used as

a work platform. Notably, once moved offshore, it was estimated that Big Foot would remain attached to the seabed and thus not move for at least twenty years. Because Big Foot was constructed for stationary purposes, lacking inherent mobility features necessary for movement over water, the Fifth Circuit held that a reasonable observer would not consider it designed to a practical degree for transportation. For alike reasons that distinguish the AMOS RUNNER from the quarterbarge, the same clearly apply regarding the tension leg platform.

Not only was the AMOS RUNNER, at all times, capable of maritime transportation, it was actually used for such, including the time at which it embarked across the Gulf of Mexico to Mobile. *See The Alabama*, 19 F. 544, 546 (S.D. Ala. 1884) (vessels possess mobility and capacity to navigate, unlike fixed structures like wharves, drydocks, and bridges). A fundamental notion in the succession of vessel status cases is that a marine structure, designed for seagoing movement, cannot maneuver across the sea with no law to govern it. To detach admiralty jurisdiction under such circumstances would cause havoc and undermine maritime law's overwhelming goals of uniformity, harmony, and consistency. Both the quarterbarge and the Big Foot referenced above lacked the mobility and capabilities of maritime navigation such that a reasonable observer would not consider either practically designed for maritime transportation. These are critical points of distinction vis-à-vis the AMOS RUNNER.

Additionally, as one federal district court from the Fifth Circuit found in determining vessel status, it is legally insignificant and unpersuasive that a structure has not moved for multiple years; such an argument ignores an overarching focus of the inquiry, which is capability of navigation. *BW Offshore USA, LLC v. TVT Offshore AS*, 145 F. Supp. 3d 658, 663-64 (E.D. La. 2015) (rejecting the argument against vessel status based on the fact that a production facility had not moved for four years). Admiralty courts have consistently ruled that a structure does not lose vessel

status, or otherwise go in and out of admiralty jurisdiction, merely because it is not in transit for a snapshot in time. *Id*. Practical capability is key. To hold otherwise would erode the logic of maritime law on vessel status, such as that provided for in *Stewart*.

As outlined by the Supreme Court in *Stewart*, the AMOS RUNNER'S status as a "vessel" under General Maritime Law must turn on whether it is "practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." 543 U.S. at 497. The AMOS RUNNER is clearly a vessel under *Stewart*. Like an ordinary MODU, the rig was stacked offshore, not moored or otherwise attached to the seabed in a permanent fashion. It is designed to be transported from one location to another, either for drilling, shipyard work or lay up, by navigating as a waterborne floating vessel that is placed under towage. While briefly laid up in the Gulf of Mexico, the rig was found to be in good material condition and suitable for coastwide towage between berths. Its ballasting system was operational at all relevant times and remains operational. Further, Blake operated the system in order to refloat and allow it to be navigated on water. Nonetheless, EPIC ignores this typical semi-submersible configuration and bases its argument on future intentions, and not the practical capability of navigation.

      **2.**       **The AMOS RUNNER was not "removed from navigation" nor was it a "dead ship," as its *practical capability* as means for transportation was and has not been impaired.**

EPIC further suggests that even if the AMOS RUNNER was once a vessel, it had been removed from navigation and thus lost vessel status. Justice Thomas noted, "structures may lose their character as vessels if they have been withdrawn from the water for extended periods of time" such that they are no longer practically capable of being used as a means of transportation on water. *Stewart*, 543 U.S. at 496.

EPIC presents this argument by portraying the AMOS RUNNER as a derelict structure

11

solely fit for scrapping. This simply is not dispositive to the issue at hand. Admiralty courts reject these arguments as "unavailing and irrelevant." *La. Int'l Marine, L.L.C. v. Drilling Rig Atlas Century*, 2012 U.S. Dist. LEXIS 40781, at *17 (S.D. Tex. Mar. 9, 2012) ("Even if the rig was a floating hulk solely fit for the scrapyard, dilapidated structures are not disqualified from being vessels as a matter of law"). Contrary to EPIC's position, "a somewhat minimal showing of buoyancy and mobility may permit vessel classification." *Id.*; *see also Advance Welding Co. v. M/V Corra D*, 299 F. Supp. 736, 736, 738 (E.D. La. 1969) (vessel which caught fire and burned at sea in accident and declared a "total loss" by underwriters did not lose vessel status because "the hull, ribbing and keel…remained intact after the fire" and "was capable of navigation while under tow"); *Colonna's Shipyard, Inc. v. U.S.A.F. Gen. Hoyt S. Vandenberg*, 584 F. Supp. 2d 863, 867 (E.D. Va. 2008) (<u>obsolete steamship remained idle for years prior to being prepared for sinking and transformation to artificial reef remained a vessel because repairs were commenced to allow the steamship to be "towed on water"</u>). "It is therefore of no moment that [a rig] would presently be unable to serve in any economically viable capacity pending refitting and restoration." *La. Int'l Marine, L.L.C.*, 2012 U.S. Dist. LEXIS, at *20.

Again, the key is whether the structure is practically capable of navigation. This is true test "in all cases." *Stewart*, 543 U.S. at 496. It has been explicitly recognized, in light of *Stewart*, cases such as *Roper v. United States*, 368 U.S. 20 (1961) (cited by EPIC) "must now be read in light of *Stewart's* clarification that the true test for vessel status in all cases is whether a ship is practically capable of maritime transportation," and "not whether it is 'in navigation' or whether its 'primary purpose' is to transport goods or people on water." *Colonna's Shipyard*, 584 F. Supp. at 874 n.14.

**3.   A finding that the AMOS RUNNER was not a vessel under the present circumstances would compromise the purposes of admiralty jurisdiction.**

"The fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce." *Exxon Corp. v. Cent. Gulf Lines, Inc*., 500 U.S. 603, 608, 111 S.Ct. 2071, 2074-75, 114 L.Ed.2d 649, 656 (1991). What EPIC proposes is wholly inconsistent with that interest. As previously stated, the AMOS RUNNER simply cannot be towed to sea with no law to govern it. The current economic state of the market upon which she relies for demand of her service cannot dictate her status as a "vessel," just as the same cannot divest an admiralty court from exercising its jurisdiction. More specifically, a vessel does not cease to be a vessel merely because she is stacked or anchored offshore, while at the same time maintaining her practical capabilities of transiting the sea. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 373, 115 S.Ct. 2172, 2192, 132 L.Ed.2d 314, 341 (1995). The mobile and transient characteristics of the AMOS RUNNER, including its operational deballasting system, are clearly indicated by its oceangoing tow to Mobile, Alabama. Moreover, it is currently being marketed to foreign buyers, transactions which would necessarily require it to move on water yet again. Unsurprisingly then, the AMOS RUNNER remains operationally capable of being deballasted, refloated and moved from location to location just as it  has been for more than two decades in the oil field service. This is more than enough to retain vessel status.

## IV.   CONCLUSION

For the foregoing reasons, the AMOS RUNNER is a vessel under general maritime law and this Court has admiralty jurisdiction over this matter. Accordingly, EPIC's Motion to Dismiss Arrest must be denied.

*/s/ Norman M. Stockman*
NORMAN M. STOCKMAN
BLANE H. CRUTCHFIELD
Attorney for Plaintiff Blake Marine Group, LLC

OF COUNSEL:

HAND ARENDALL HARRISON SALE LLC
Post Office Box 123
Mobile, Alabama  36601
Tel:    (251) 432-5511
Fax:    (251) 694-6375
Email: nstockman@handfirm.com
         bcrutchfield@handfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2019, the foregoing document was filed with the Clerk of the Court using the CM/ECF filing system which will send notification of such filing to the following:

Grady S. Hurley, Esq.
Jennifer David, Esq.
Jones Walker LLP
201 St. Charles Avenue
New Orleans, LA 70170
ghurley@joneswalker.com
jdavid@joneswalker.com

James Rebarchak, Esq.
Jones Walker LLP
11 N. Water St., Suite 1200
Mobile, AL 36602
jrebarchak@joneswalker.com

*/s/ Norman M. Stockman*
NORMAN M. STOCKMAN

3769617_1.docx